FILED_____ ENTERED
LOGGED_____ RECEIVED

MAY 0 8 2025

AT GREENBELT
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY ___ DEPUTY

**ATTACHMENT A**
**STATEMENT OF FACTS**

*The undersigned parties stipulate and agree that if this case had proceeded to trial, the Government would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.*

## RELEVANT INDIVIDUALS AND ENTITIES

At all times relevant to the offense:

Defendant **RODERICK WATSON ("WATSON")** was a contracting officer employed by the United States Agency for International Development ("USAID"), which was a government agency responsible for distributing foreign aid that was headquartered in Washington, D.C.

Co-schemer 1 ("CC-1") was the President of Company 1, which was headquartered in Washington, D.C., and which contracted with USAID to provide various services.

Co-schemer 2 ("CC-2") was the President of Company 2, a government contractor headquartered in Maryland, with a Washington, D.C. office in the same building as USAID headquarters. Company 2 was also a certified small business under the 8(a) contracting program for socially and economically disadvantaged businesses administered by the U.S. Small Business Administration ("SBA"), which was a government agency headquartered in Washington, D.C. At times, CC-1 and Company 1 hired CC-2 and Company 2 to serve as a USAID subcontractor and vice versa.

Co-schemer 3 ("CC-3") was the President of Company 3, which was headquartered in Maryland, and which at times was hired by CC-2 and Company 2 to serve as a subcontractor on USAID contracts.

Co-schemer 4 ("CC-4") was a former employee of Company 1 and later a contracting officer at USAID.

## THE BRIBERY SCHEME

Between in or around 2013 and 2023, **WATSON** executed a scheme with CC-1, CC-2, and CC-3 to pay bribes to **WATSON** in exchange for **WATSON** agreeing to influence the award of approximately $552.5 million dollars' worth of USAID contracts to Company 1 and Company 2, as listed in the following table:

| | Timeframe | Contractor | Subcontractor | Contract Description | Value |
|---|---|---|---|---|---|
| 1) | 2013-2018 | Company 1 | None | Staffing Contract | $4.8 million |
| 2) | 2014-2020 | Company 1 | Company 2 | Institutional Support | $46 million |
| 3) | 2015-2015 | Company 1 | None | Knowledge Management | $22,000 |
| 4) | 2015-2018 | Company 1 | None | Communications Support | $3.9 million |

| 5) | 2018-2023 | Company 2 | Company 3 | Professional Management | $30 million |
|---|---|---|---|---|---|
| 6) | 2018-2023 | Company 2 | Company 1 and 3 | Professional Management | $25.5 million |
| 7) | 2018-2022 | Company 2 | Company 3 | Administrative Support | $3.5 million |
| 8) | 2019-2025 | Company 2 | None | Cybersecurity | $19.5 million |
| 9) | 2020-2022 | Company 2 | Company 1 | Technical Support | $28.5 million |
| 10) | 2022-2027 | Company 2 | Company 3 | Administrative Support | $9 million |
| 11) | 2022-2027 | Company 2 | None | Technical Support | $95 million |
| 12) | Not Awarded | Company 2 | None | Planning and Learning | $143 million |
| 13) | Not Awarded | Company 2 | None | Planning and Learning | $94 million |
| 14) | Not Awarded | Company 2 | None | Professional Management | $49.8 million |
| **Approximate Total Value of Contracts** | | | | | **$552.5 million** |

### A.     Company 1 Prime Contracts 1-4 (Appx. Value of $45.8 Million)

On or about April 30, 2013, CC-1 emailed CC-2 that CC-1 was going "to USAID Administrator's Office to close this sole source deal." That same day, Company 1 obtained its first USAID contract. CC-1 then began to give **WATSON** bribe payments for USAID contracts.

On or about July 15, 2014, **WATSON** texted CC-3, "[C]an you please talk to [CC-1] sooner rather than later[.]"

On or about August 8, 2014, a few weeks before Company 1 was awarded its second USAID contract, CC-1 discussed with CC-3 ways to conceal the bribe payments to **WATSON**. CC-1 texted CC-3, "[I]f possible, give it to some other third party to give him. That way you can honestly say you never gave him anything … never give anything but cash to you know who."

On or about September 11, 2014, **WATSON** texted CC-3 that he wanted CC-1 to buy him an iPhone 6 because **WATSON** "like[d] shiney objects!!!" A few days later, Company 1 obtained its second USAID Contract. Shortly thereafter, CC-1 gave **WATSON** the iPhone through CC-3.

On or about June 22, 2015, CC-2 and Company 2 became a subcontractor to Company 1 on Contract 2. Within approximately three months, **WATSON** became the contracting officer representative on Contract 2.

On or about November 22, 2015, CC-3 texted CC-1 about **WATSON** and the scheme: "Also let's sometime this week talk about our boy. I talked with him last night. Gave me the full picture. Which you probably got out of our last meeting with him. I now understand his deal." CC-1 replied, "Yep. I know what he wants. I thought about dropping out of the USAID contract just so you could decide objectively whether you wanted to keep helping him." CC-1 added, "It is [a] form of blackmail[.]"

On or about June 2, 2016, CC-3 texted to CC-1 about **WATSON** and his role in the scheme:

As much as this crap with [**WATSON**] bothers me I will not let this cause a rift between you and I. To get his way he is trying to do this. I hate being the pawn in this. This might be how some business get done but I think he is trying to take

12

advantage of our friendship to get what he wants. I know how to play the game but
damm. I know there is a lot of money involved but he is using this as a position of
power. The only reason I am playing this game is for you. If he thinks this is
friendship this not. It's manipulation. I am trying to get my stuff together. This crap
doesn't benefit me at all. It might hurt. Just let me know what the invoice should
look like.

CC-1 thereafter responded by stating, among other things, "[T]his is Not how business is done.
This is extortion[.]"

On or about September 26, 2016, CC-3 texted CC-2, "I was told by [**WATSON**] to play
this game because millions are involved so I am. I will handle it. Waiting for [CC-1's] reply."
Three days later, CC-2 texted CC-3, "Out of USAID? You think he wants out?"  CC-3 replied,
"Yes. He is not planning to do anymore business with them … Doesn't want to do anymore pay
to play."  CC-2 replied, "I see[.]"

In or around 2017, Company 1 graduated from the SBA's 8(a) program and was no longer
eligible to be a prime contractor for new USAID contracts under this program. The scheme then
shifted such that CC-2 and Company 2 became the USAID prime contractor, and Company 1
served as Company 2's subcontractor on contracts awarded through **WATSON**.

### B.    Company 2 Prime Contracts 5-14 (Appx. Value of $497.8 Million)

### i.    Contract 5 (Awarded, Appx. Value of $30 Million)

On or about April 27, 2017, CC-2 and CC-3 texted to discuss a strategy for Company 2 to
obtain contracts via **WATSON**.  The next month, in reply to a text from CC-2 about meeting with
**WATSON**, CC-3 noted, "[**WATSON**] is bugging me about the money so I will ask again tonight."

CC-2 replied, "about paying him or what we will allocate?"

CC-3 replied, "His current payment[.]"

CC-2 replied, "So you're going to the bank right?"

CC-3 replied, "when the money hits my account."

In or around July 2017, **WATSON** received bribe payments from CC-1 to pay for a
residential mortgage.  On or about July 5, 2017, CC-3 texted **WATSON**, "Hey [CC-1] just thought
of this. Can [CC-1] give the money through a bonus to [CC-4]?"  Later that day, CC-3 texted CC-
1, "Waiting on [**WATSON**] to get back to me on [CC-4.]"  CC-1 replied, "We can wire
tomorrow[.]"  Later that day, CC-3 replied to CC-1, "[**WATSON**] is not comfortable with that
option. Want as few eyes as possible. Especially women. his words. Will invoice tonight[.] On
FaceTime with [**WATSON**] now[.]"  CC-1 replied, "Cool I'm good with that[.]"  CC-3 transferred
$17,000 to **WATSON**, which was financed by CC-1 and Company 1.  **WATSON** used these funds
to help secure the residential mortgage.  During this time period, **WATSON** received from CC-1

a past performance document for Company 1, which **WATSON** signed and sent to another U.S. government agency on CC-1 and Company 1's behalf.

On or about August 14, 2017, **WATSON** texted CC-3 about CC-1, "So your boy [CC-1]--to talk about real business—doesn't answer my text[.]  Or phone calls[.]  To add money to his awards[.]  Amazing[.]  Maybe [CC-2] could/will do better[.]  It's up for recompete[.]"

On or about September 6, 2017, CC-3 texted **WATSON**, "Have you talked with [CC-1]?  I am getting ready to send my invoice."

On or about October 24, 2017, **WATSON** texted CC-3, "You got me covered? Gotta pay the Piper ...."  CC-3 replied, "Yes[.]"

On or about November 20, 2017, **WATSON** texted CC-3: "Bruh about and about. I know this is a FaceTime convo but can we make sure that we are on time this month .. for this week as I don[']t want to cuss a certain person out this week for stuff because you and I got delayed ... just came to my mind and I don[']t want no hassle for thanksgiving."

On or about March 1, 2018, CC-3 texted CC-2, "Send [**WATSON**] your cap [capability] statement.  There maybe [sic] a sole source [contract] in our future.  Big money[.]"

CC-2 replied, "Ok will do[.]"

CC-3 replied, "[**WATSON**] needs it for tomorrow morning."

CC-2 replied, "Sent[.]"

In the email sent to **WATSON**, CC-2 stated, "Mr. [**WATSON**], Please see the attached capability statement.  Feel free to contact me with any questions."

On or about March 27, 2018, CC-3 and **WATSON** continued to discuss whether CC-2 and Company 2 could serve as the prime contractor on a USAID contract.  **WATSON** texted CC-3, "Will need to have a discussion with you [CC-3] and [CC-2] about a [Request for Proposal] that I'll need to put out.  Have to decide on an approach[.]"  To aid that discussion, CC-3 texted CC-2, "What's your Thursday or Friday afternoon look like?  [**WATSON**] wants to discuss a Rfp he [is] putting out."

On or about March 28, 2018, **WATSON** emailed both CC-2 and CC-3: "[L]et me know if your firm has 'near' capability to either lead/manage or JV [joint venture]."  **WATSON** attached a "Market Research Memo," which listed 18 small businesses capable of completing the contract—and which did not list Company 2—although as described below, **WATSON** later added Company 2 to the list in an effort to influence the award of a USAID contract to Company 2 when **WATSON** recommended that the SBA approve a sole source, noncompetitive contract to Company 2.  In addition, **WATSON** attached a statement of work for the contract with the following label, "[PROCUREMENT SENSITIVE_ DO NOT SHARE]".

On or about March 29, 2018, two days after **WATSON** shared the procurement-sensitive information, CC-3 texted CC-2 about buying a suite to watch a basketball game, "$3000 for the suite next Friday. You good?" CC-2 replied, "Call me[.]" CC-3 later texted **WATSON**, "Don't be asking questions. Getting a suite for the [W]izards game." **WATSON** replied, "Phase One has been approved[.]"

On or about April 6, 2018, CC-2 texted CC-3, "Need to make sure [**WATSON**] stays focused and doesn't give in to [CC-1's] bribes[.]" CC-3 replied, "Believe me that will not happen[.]" CC-2 replied, "I hear you[.]" Later that day, CC-2 further texted, "I haven't received anything from usaid yet[.]" CC-3 replied, "You will probably not see anything till next week. The girl is out of the office. According to [**WATSON**]." CC-2 replied, "Ok got it[.]"

On or about April 13, 2018, CC-3 texted **WATSON**, "I talked with [CC-1] and we should be able to work it out with [CC-2, CC-1] and I. [CC-1] said if that is what I wanted to do. We will meet in the morning. I do know [CC-2] is on board. [CC-1 should talk to him this morning." **WATSON** replied, "Wait that was a given ... did y[o]u speak to my concerns?" CC-3 replied, "Yes that was part of the conversation."

On or about April 24, 2018, CC-2 texted CC-3 about arranging "a sit down w[ith] [**WATSON**] again" to "iron out [an] agreement[.]" Five days later, CC-2 texted CC-3, "Good meet up w [**WATSON**.]" CC-3 replied that CC-2 "cleared things up. Moving forward everyone is going to be happy[.]"

On or about May 3, 2018, **WATSON** emailed CC-2 and CC-3: "Please find attached a [Request for Information] that requires response prior to providing your firm consideration of a Sole Source Award[.]" CC-2 emailed **WATSON** a response from Company 2 and Company 3.

On or about June 14, 2018, **WATSON** emailed a memorandum to the SBA, which **WATSON** signed, and in which **WATSON** requested a sole source, non-competitive award of $22 million to Company 2. In the email to the SBA, **WATSON** copied CC-2. In the memorandum, **WATSON** attempted to influence the award of the contract to CC-2 and Company 2. Specifically, **WATSON** stated in the memorandum:

> USAID conducted market research of firms capable of meeting stated need. Taking into consideration the needed services, experience in international development, security requirements, and timeframes, one organization, [Company 2], was identified as best suited to meet the agency's needs for administrative support services. The market research was conducted independently for this new requirement.

Moreover, **WATSON** further requested an exception for Company 2 to be awarded a higher amount—specifically, $18 million higher—than the SBA threshold for sole source contracts, above which contracts must be pursued on a competitive basis: "**Request for Competitive Award Over Competitive Threshold –** This request is for a sole source award with an anticipated value of (not to exceed) $22,000,000, which is over the competitive threshold of $4,000,000[.]"

15

On or about June 20, 2018, a USAID employee, who was copied on the foregoing email to the SBA, texted **WATSON**: "[A USAID Small Business Specialist] now wants copy of Market Research Memo. I have it dated March 9, 2018. It does not have [Company 2] listed[.] [I]s this an issue? Let me know your thoughts before I forward to [the Small Business Specialist]." **WATSON** replied, "Just texted u back."

On or about June 21, 2018, the same USAID employee who sent the prior text sent an email to **WATSON** with "REVISED MARKET RESEARCH for your review and edits" in the subject line. The USAID employee sent a new list of companies, which included Company 2, and stated, "I have attached a copy of the original Market Research Memo provided to [the Office of Acquisitions and Assistance] by [a USAID employee] dated March 9, 2018. I think it is best to keep the March 9, 2018 date on the revised letter." Later that day, the USAID employee sent a follow up email to **WATSON**: "Just wanted to make sure you got my draft from earlier this morning (see email below)." **WATSON** replied, "I did, thanks! It looks good please forward to [another USAID employee] to make sure the process moves on."

On or about June 27, 2018, in a letter addressed to **WATSON**, the SBA approved **WATSON's** request for the sole source award to Company 2, but for $4 million, which was the maximum threshold for SBA sole source contracts, above which contracts had to be sought on a competitive basis.

On or about July 31, 2018, shortly before USAID awarded CC-2 and Company 2 its first prime contract, **WATSON** discussed with CC-3 how he would approach CC-2 to ask for payments. **WATSON** texted CC-3, "I[`]m starting money talk with [CC-2] just to test the water[.]" CC-3 replied, "Do your thing my brother … Hes [sic] expecting the talk." **WATSON** later texted CC-3, "I[`]m sure you appreciate the PRE work that goes into all of this—and it[`]s work[.] Just to get people [in] the program office to see things my way[.]"

On or about August 15, 2018, USAID awarded CC-2 and Company 2 its first contract (Contract 5).

On the same day, **WATSON** texted CC-3, "[I]t[`]s like I[`]m out here on my own making deals so others can flourish no matter the amount I get monthly it[`]s not the same as owning a business and flourishing for self … it[`]s like being on an island waiting for all the shit to hit the fan[.]" CC-3 replied, "I get what you are saying. Why don[`]t you make that leap. I would help 100%. We could team or however you want to[.]" **WATSON** replied, "Not until this all comes full circle and where I am sure that I am thoroughly entrenched with future projects with [US]AID and now the State Department... at least 2yrs[.]"

### ii.    Contracts 6, 7 (Awarded, Appx. Value of $29 Million)

On or about September 11, 2018, USAID awarded CC-2 and Company 2 a second contract (Contract 6) for which Company 1 was a subcontractor. In the email, **WATSON** formally referred to CC-2 as "Mr." and stated: "Please also provide times . . .  to meet for a formal award kickoff meeting with me … Congratulations on your award and your future work with USAID."

On or about October 3, 2018, CC-2 and Company 2 were awarded their third USAID contract (Contract 7) through **WATSON**. Both **WATSON** and CC-2 signed the contract.

After contracts were awarded during the scheme, **WATSON** continued to influence decisions on contracts awarded to CC-2 and Company 2, including decisions to increase funding on contracts. For example, on or about December 4, 2018, **WATSON** and CC-2 signed a modification to Contract 5 (which Company 2 received as described above). The modification enabled **WATSON** to increase the funding on the contract to exceed $4 million, which was the previous amount that SBA approved as the sole source threshold.

### iii.    Contract 8 (Awarded, Appx. Value of $19.5 Million)

In or around the summer of 2019, **WATSON** and his co-schemers continued to discuss the scheme to secure contracts via bribes. For example, emails and text messages among CC-2, CC-3, and **WATSON** on or about July 10 and 11, 2019, show that they met at a restaurant shortly before USAID awarded Company 2 another contract. After exchanging texts about the meeting, CC-2 replied on July 11, "[S]ee y'all there," and a few hours later, "At the bar, got a table for three[.]"

On or about August 16, 2019, CC-2 and Company 2 were awarded their fourth contract (Contract 8).

### iv.    Contract 9 (Awarded, Appx. Value of $28.5 Million)

In or around the months leading to USAID's award of a fifth contract to CC-2 and Company 2, CC-2, CC-1, CC-3, and **WATSON** continued engaging in the bribe scheme. On or about January 2, 2020, CC-2 texted CC-3, "Has [Company 1] paid you yet?" The next day, CC-2 texted CC-3, "Did [Company 1] get back to you?" On or about January 7, 2020, CC-2 texted CC-3, "Did [Company 1] pay you?"

CC-3 replied, "[I'm] on the phone with [CC-1]." CC-3 then funneled monthly payments to **WATSON** that increased around this time from $4,000 to $7,500. Furthermore, **WATSON** had requested the increased bribe payments.

On or about January 13, 2020, CC-2 arranged for CC-3's company (Company 3) to serve as a subcontractor to CC-2 and Company 2 on a USAID contract. That day, **WATSON** emailed CC-2 and blind carbon copied CC-3. The email included a document titled, "USAID endorsement letter to [Company 3]." This was an official USAID letter from **WATSON** to CC-2 and Company 2, which stated Company 2 was "requesting to add [Company 3] to this contract as a sub-contractor." The letter also stated: "It is to my [**WATSON's**] understanding that [Company 3] brings a capability in agile solutions and IT managed services which will support [Company 2] in satisfying their contractual requirements on both the unclassified side and classified support side up to Top Secret level." **WATSON** thereafter approved CC-2's request to add Company 3 as a subcontractor.

In or around July 2020, CC-2 and Company 2 were awarded their fifth contract (Contract 9) through **WATSON**. Company 1 served as a subcontractor to Company 2 on the contract.

As described above, after contracts were awarded during the scheme, **WATSON** continued to influence decisions on contracts awarded to CC-2 and Company 2, including decisions to increase funding on contracts. For example, on or about May 3, 2021, a Program Analyst from USAID sent an email to **WATSON** with concerns about the cost increase on Contract 9. The Analyst recommended a 2% rate increase instead of Company 2's proposed rate increase of 3%. The Analyst asked **WATSON**, "As CO [Contracting Officer], can you negotiate the rate down?" **WATSON** sent an email reply, with a blind carbon copy to CC-2, explaining that 3% is the norm. **WATSON** also explained that Contract Officers normally approve escalation rates between 3% and 5%. On or about May 25, 2021, **WATSON** signed a modification increasing the funding on Contract 9 based on Company 2's proposed rate.

### v.    Contracts 10, 11 (Awarded, Appx. Value of $104 Million)

In or around May 2021, CC-2 communicated with CC-4 about CC-2 making a downpayment for a wedding for **WATSON** at a country club, which took place in August 2021.

On or about June 30, 2021, **WATSON** attended a USAID planning meeting for Contract 10, which had not yet been awarded to Company 2. **WATSON** made a recommendation at the meeting to award Contract 10 to companies participating in the SBA 8(a) program. At the time, Company 2 was still participating in the SBA 8(a) program.

In or around July and August 2021, CC-2 paid for a country club wedding for **WATSON**, which cost over $30,000. Around this time, CC-2 arranged with CC-3 to use a sham company and invoice to send a separate $30,000 to **WATSON**.

In addition, the week of the wedding, **WATSON** and CC-2 signed a modification to the first USAID prime contract awarded to Company 2 (Contract 5), increasing the funding by approximately $1.3 million.

In or around August 2021, following **WATSON's** wedding, CC-2 continued to transfer payments to **WATSON** via Company 2 and Company 3 (through CC-3 as an intermediary). Examples of such transfers include CC-3 transferring to **WATSON** the same amount of money that CC-2 transferred to CC-3 on the same day.

In or around September 2021, **WATSON** and CC-4 exchanged via USAID text messaging and email the above-referenced modification that **WATSON** signed the week of the wedding.

As described above, after contracts were awarded during the scheme, **WATSON** continued to influence decisions on contracts awarded to CC-2 and Company 2, including decisions to increase funding on contracts. For example, on or about September 28, 2021, **WATSON** approved a modification to raise the contract ceiling on Contract 5 (which was the first USAID contract awarded to Company 2) from $24 million to $30 million. The same day, CC-2 received a text from an employee at Company 3 stating that **WATSON** "raised the ceiling to 30M and will use a

J&A [Justification and Approval for Other Than Full and Open Competition Memorandum] for the next to push it to 88M." In sum, **WATSON** influenced the award of a $4 million sole source contract (Contract 5), and **WATSON** further influenced increased funding during the life of the contract up to approximately $30 million.

In or around March and May 2022, CC-2 and Company 2 were awarded their sixth and seventh USAID contracts (Contracts 10 and 11). Around this time, **WATSON** agreed at CC-2's request to speak with a private equity company about Company 2's performance as a government contractor on USAID contracts. **WATSON** spoke with representatives from the private equity company, during which time he omitted the material fact that CC-2 had regularly bribed **WATSON** to obtain USAID contracts for years.

### vi.    Contract 12 (Not Awarded, Appx. Value of $143 Million)

After Company 2 received seven contracts from USAID, CC-2 attempted to obtain more contracts and confidential procurement information by steering bribes to **WATSON**.

In or around August 2022, **WATSON** provided CC-2 with a technical evaluation package containing confidential source-selection information as to the status of proposals Company 2's competitors submitted for the award of a contract with a value of approximately $143 million (Contract 12). The package included USAID's assessment of the strengths and weaknesses of bids indicating that Company 2 was not the top candidate. During the same month and the following month, CC-2 withdrew funds from a Company 2 account to buy cashier's checks totaling more than $50,000, which were used to pay debts of **WATSON** and CC-4.

On September 6, 2022, CC-2 and other Company 2 employees met with **WATSON** to discuss why Company 2's proposal was not the top candidate for Contract 12. Following the meeting, two Company 2 employees exchanged text messages regarding the meeting: "We give Rob [sic] the best possible ammo and then we tie it all back for him he gives us an [sic] corrective action and we can slide in there."

On or about September 9, 2022, **WATSON** established a competitive range for the procurement and considered proposals from offerors within the competitive range, which gave Company 2 another opportunity to bid on Contract 12 (which ultimately was not awarded because the scheme came to the attention of USAID, as described below).

In or around October 2022, as the evaluation of bids was ongoing, CC-4 communicated with CC-3 about funneling approximately $60,000 in two transfers from CC-3 to **WATSON**. **WATSON** used these payments at a closing to purchase a new home. The next month, **WATSON** submitted to the lender a "Gift Letter" which falsely listed CC-2 as "Cousin" and which related to two of the above-described checks.

### vii.    Contracts 13, 14 (Not Awarded, Appx. Value of $143.8 Million)

On or about January 18, 2023, around which time the scheme came to USAID's attention, **WATSON** texted CC-2, "Was told today that we are back at business as usual. That there are no

findings. … From me to you.  We can't get lax ever again. Gotta stay tight.  This coulda [sic] gone way worse.  I gotta admit to you that I was way pissed at how all of this happened as I am sure you can understand."

CC-2 replied, "Yes but understand and I feel horrible and sorry about it all."  Having not been fully revealed, the scheme continued, but no additional contracts were awarded to Company 2 as a result.

As part of the bribery scheme summarized above, **WATSON** intended to profit and did in fact profit from corruptly demanding, seeking, receiving, accepting, and agreeing to receive or accept a thing of value in return for being influenced in the performance of an official act, namely **WATSON's** award of USAID contracts to CC-1's company (Company 1) and CC-2's company (Company 2).  Moreover, **WATSON** knew that CC-1 and CC-2 were providing things of value to **WATSON** in exchange for **WATSON**'s influence of official acts on contracts to Company 1 and Company 2.

[cont'd]

Furthermore, to conceal the bribery scheme, **WATSON** and CC-4 falsely stated that **WATSON** and CC-4 did not receive any outside sources of income or gifts in multiple U.S. Office of Government Ethics financial disclosure reports that **WATSON** and CC-4 filed with USAID. The purpose of such reports, which **WATSON** knew, was to help USAID identify and prevent conflicts of interest between an employee's official duties and their financial interests.

During the course of the scheme, CC-2 paid **WATSON** more than $150,000 in bribes.

SO STIPULATED:

Lorinda I. Laryea
Acting Chief
U.S. Department of Justice
Criminal Division, Fraud Section

Matt Kahn
Brandon Burkart
Trial Attorneys
U.S. Department of Justice
Criminal Division, Fraud Section

Kelly O. Hayes
United States Attorney
District of Maryland

Patrick D. Kibbe
Assistant United States Attorney
District of Maryland

Roderick Watson
Defendant

Ellie C. Marranzini, Esq.
Assistant Federal Public Defender
*Counsel for the Defendant*